UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDWARD ROBERTS, LLC, d/b/a ERlifescience<br><br>Plaintiffs,<br><br>v.<br><br>INDIANA ECONOMIC DEVELOPMENT CORP.,<br><br>Defendants. | Civil Action No. _____<br><br>JURY TRIAL DEMANDED |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Edward Roberts, LLC, d/b/a ERlifescience, ("Edward Roberts, LLC") by and through their attorneys, Rubinstein & Corozzo, LLP, hereby alleges as follows:

**JURISDICTION AND VENUE**

1. The amount in controversy, exclusive of interest and costs, exceeds $75,000 and the parties are citizens of different states, so this Court has jurisdiction over this action under 28 U.S.C. § 1332(a)(1)

2. Because a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District of New York, venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1).

1

## PARTIES

3. Plaintiff Edward Roberts, LLC is a domestic limited liability corporation with (at the time of the relevant events) its principal place of business at 417 5th Avenue, New York, New York 10016. All members of Edward Roberts, LLC are citizens of New York and Edward Roberts, LLC is therefore also a citizen of New York.

4. Defendant Indiana Economic Development Corporation ("IEDC") is a public-private partnership with its principal place of business at 1 North Capitol Ave, Suite 700, Indianapolis, Indiana 46204. The IEDC is "a body politic and corporate, not a state agency but an independent instrumentality exercising essential public functions." Ind. Code § 5-28-3-2 (2019). And "[e]mployees of the corporation are not employees of the state." Ind. Code § 5-28-3-3 (2019). The IEDC is a citizen of Indiana.

## STATEMENT OF FACTS

### A. Defendant IEDC purchases 1 million N-95 masks from Plaintiff Edward Roberts

5. In September 2020, the Indiana Economic Development Corporation, through its SVP, Chief of Staff Luke Bosso, sought to buy N95 masks from Edward Roberts, LLC. (Exhibit 1).

6. Edward Roberts then offered to sell the IEDC Harley N-95s at a cost of $2.95 per mask and Mr. Bosso requested a box of masks as samples. (*Id.*).

7. On or about September 21, 2020, Edward Roberts sent Mr. Bosso samples of two different styles of N-95 masks and Mr. Bosso requested that Edward Roberts hold 1 million masks for possible purchase by the IEDC. (*Id.*).

8. On September 22, 2020, Mr. Bosso confirmed receipt of the samples and asked Edward Roberts to provide references from other states they had sold personal protective equipment to. (Exhibit 2).

9. On that same day, Mr. Bosso informed Edward Roberts that they would need to get registered as a state vendor and asked how long it would take to get the masks to Indiana because he wanted to put in an order "ASAP." (*Id.*).

10. On September 25, 2020, Edward Roberts spoke by phone with Mr. Bosso and, during that call, Mr. Bosso, on behalf of the IEDC, asked to purchase 1 million Harley model L-288 N95 masks.

11. On September 29 and October 1, 2020, Edward Roberts sought information on when the IEDC would provide a purchase order for the 1 million masks. On October 1 Mr. Bosso responded that he "should have the PO to [Edward Roberts] today or tomorrow." (Exhibit 3).

12. On October 5, 2020, Edward Roberts again requested the purchase order and shipping information, and informed Mr. Bosso that the masks were "ready to ship out immediately." (Exhibit 4). In response, Mr. Bosso told Edward Roberts to deliver the masks to the National Guard Association of Indiana, 2002 S. Holt Road, Building 12, Indianapolis, Indiana 46241. (*Id.*).

13. After some additional back and forth about shipping, on October 8, 2020, Mr. Bosso informed Edward Roberts that the purchase order would be generated "shortly." (Exhibit 5).

14. Mr. Bosso then sent a follow-up stating:

> Just to be clear as we discussed the terms will be as follows:
>
> 1. 15 calendar days invoiced will be issued.
>
> 2. Respirators must pass Indiana fit test plus all federal standards as layer out by CDC/NIOSH/FDA and have all documentation that shows they are real.
>
> 3. If respirators do not pass inspection Indiana will not pay for the respirators.
>
> 4. Indiana has right to refuse respirators if they show up in unusable conditions.
>
> 5. ER Sciences acknowledges these respirators are NIOSH/CDC approved.
>
> 6. Indiana has the right to refuse respirators for any reason up to the point invoice is issued.
>
> 7. If respirators do not pass fit test standards Indiana can seize the respirators and turn them over to proper authorities.

(*Id.*).[1]

15. Edward Roberts confirmed that they understood those terms and they were acceptable. (*Id.*).

---

[1] "A fit test is performed to confirm the fit of any respirator that forms a tight seal on the wearer's face." *See* https://www.cdc.gov/niosh/npptl/topics/respirators/disp_part/respsource2.html

16.     On October 9, 2020, Mr. Bosso finally provided Edward Roberts with the purchase order number. (Exhibit 6). When Edward Roberts requested an actual written document, Mr. Bosso stated: "If you need the document we will get that over but just to be clear the number has worked for all of our other vendors." (*Id.*). No written purchase order was ever provided.

17.     In two shipments on October 9 and 14, 2020, Plaintiff delivered 976,4000 masks to the National Guard Association of Indiana, as per Defendant's instructions.

18.     On October 9, 2020, Edward Roberts issued invoices to Defendant for 1,591 cartons of masks, each containing 400 masks, for a total of 636,400 masks at a cost of $ 1,877,380.00. (Exhibit 7).

19.     On October 14, 2020, Edward Roberts issued an invoice to Defendant for 850 cartons of masks, each containing 400 masks, for a total of 340,000 masks at a cost of $1,003,000.00. (*Id.*).

**B.     The IEDC falsely claims the masks are counterfeit, seizes them, and turns them over to the Department of Homeland Security--all while lying to Edward Roberts for over a month about why payment was delayed**

20.     Instead of paying the invoices, and without informing Edward Roberts, on October 14, 2020, the IEDC turned the masks over to the United States Customs and Border Protection, claiming that they were counterfeit.

21.     Unaware that there was any problem, Edward Roberts continued to seek payment. At some point Edward Roberts was put in contact with Casey Donoghue, the Consulting Director of Marketing Analysis at the IEDC.

5

22. On November 11, 2020, Edward Roberts requested a phone call with Mr. Donoghue to discuss the past due invoices. (Exhibit 8).

23. Mr. Donoghue responded on November 13, explaining that "Mr. Bosso's office has no dominion over this sale until I conclude my analysis so please refrain from contacting anyone but me until I say otherwise." After describing some concerns he had about his "research" into the origin of the masks, he concluded by saying that "I understand this process is taking longer than you would like, but I believe that a phone call with your contact at Harley Commodities with whom you've been recently in contact as per your recent email might allow me the comfort I'd need to move forward." (*Id.*).

24. Edward Roberts responded a few hours later stating they were "highly concerned by your email and your constant delay tactics throughout this process." Edward Roberts also explained that they had been "extremely cooperative" and "given you everything you have asked for including a verified SGS report,[2] all corresponding [Bills of Lading], and lot numbers on the actual product you received as well as a contact at SGS to verify all this information." Finally, Edward Roberts noted that Mr. Donoghue had "provided no evidence as to any of the claims [he was] making," and requested a time they could speak the following Monday. (Exhibit 9).

25. On November 16, 2020, Mr. Donoghue responded, stating: "Given the lack of verifiable proof that the goods in question are authentic Harley Commodity products, I cannot in good conscience recommend the furtherance of any business

---

[2] SGS is a third-party inspection, verification, testing and certification company.

6

dealings with your company. Please be advised that all products received from ERLife have been turned over to Customs and Border Protection. . . . This concludes any and all current or future business dealings with your company or any subsidiaries there of [sic]. There is no need for further contact." (*Id.*).

C. **The masks had been inspected at the manufacturer's factory and confirmed to be authentic, and their movement from the factory to the time they were delivered is documented**

26. After the IEDC spent a full month concealing the fact that they had already seized Edward Roberts's property and turned it over to Customs and Border Protection, counsel for Edward Roberts spent several months compiling documents which established the authenticity of the masks and trace their journey from the factory to their delivery in Indiana.

27. To facilitate the IEDC's order, Edward Roberts purchased one million Harley model L-288 N95 masks manufactured by Guangzhou Harley Commodity Limited, which is located in Guangzhou, China ("Harley").

28. As their agent for the transaction, Edward Roberts used Eagle Logistics Limited, who arranged to purchase the masks from Dongguan He Bian Zu Zi Trading.

29. Harley was to deliver all the masks to Edward Roberts on September 30, 2020.

30. On September 27, 2020, SGS-CSTC Standard Technical Services Co, Ltd. Guangzhou Branch inspected the masks and confirmed their authenticity to Edward Roberts. (Exhibit 10).

31. On that same day, Grant Kwok, Eagle's representative, went to Harley's factory as shown by photos of the facility that he took himself. (Exhibit 11). Phone records also show Mr. Kwok's communications with Mrs. Ouyang Yuyan, his contact at Harley. (*Id.*).

32. From there, shipping records track the path of the masks from Harley's factory as 2,500 cartons were picked up by Dongguan in six trucks. On September 29, 2020, three trucks picked up masks at Harley's warehouse and transported them to the warehouse of Western Global Airlines at Modern International Logistics Park in Shenzhen, China. One truck contained 630 cartons (252,000 masks), a second truck contained 520 cartons (208,000 masks), and a third truck contained 140 cartons (56,000 masks). (Exhibit 12).

33. On September 30, 2020, another two truckloads went from Harley's factory to the LinkTrans warehouse located in the Baoan District in Shenzhen, China. The first truck contained 630 cartons (252,000 masks) and the second truck contained 190 cartons (76,000 masks). (*Id.*).

34. Finally, and also on September 30, 2020, one truck went directly from Harley's factory to the China Customs Surveillance Area at Shenzhen Baoan Airport. That truck contained 390 cartons (156,000 masks), and Grant Kwok was present when they were unloaded at the airport. (*Id.*).

35. Next, all 2,500 cartons were inspected at Shenzhen Airport Customs in China. On September 30, 2020, a total of 390 cartons (156,000 masks) were inspected. On October 2, 2020, a total of 820 cartons (328,000 masks) were

8

inspected. On October 4, 2020, 645 cartons (258,000 masks) were inspected, And on October 5, 2020, an additional 645 cartons (258,000 masks) were inspected. (Exhibit 13).

36. The masks then traveled to Chicago via several different airlines, all arranged by CAF Worldwide, as shown by Air Waybills (with corresponding Delivery Orders and U.S. Customs forms), as follows:

| Date | Cartons | Waybills (last 4 digits) |
|---|---|---|
| October 2, 2020 | 390 | 4121, 7874 |
| October 3, 2020 | 300 | 4880 |
| October 4, 2020 | 260 | 1670 |
| October 5, 2020 | 1,550 | 1026, 1681, 3782 |

(Exhibit 14).

## FIRST CLAIM FOR RELIEF

### (Breach of contract)

37. Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 36 as if fully set forth herein.

38. On or about October 8, 2020, Plaintiff and Defendant entered into a contract by which Plaintiff agreed to provide 1 million units of Harley model L-288 N95 masks to Defendant at a cost of $2.95 per mask, for a total purchase price of $2,950,000.00.

39. Plaintiff performed its obligations under the contract by delivering 976,400 authentic Harley model L-288 N95 masks to the National Guard Association of Indiana in two shipments on October 9 and 14, 2020.

40. Under the terms set forth by Defendant on October 8, 2020, Defendant could refuse to accept delivery of the respirators for any reason, at which point the masks would be returned to Plaintiff.

41. Instead of refusing delivery, defendant breached the contract by accepting the masks and then failing to pay Plaintiff the agreed upon sum of $2.95 per mask.

**42.** As the result of Defendant's breach of contract, Plaintiff has been damaged in an amount to be determined by the court, but no less than $2,880,380.

## SECOND CLAIM FOR RELIEF

### (Conversion)

43. Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 36 as if fully set forth herein.

44. To fulfill their obligations under the contract, Plaintiff purchased 1 million Harley model L-288 N95 masks manufactured by Guangzhou Harley Commodity Limited, which is located in Guangzhou, China, at a total cost to Plaintiff of $1,903,300, and had them delivered to Defendant.

45. Under the terms set forth by Defendant on October 8, 2020, only if the masks "d[id] not pass fit test standards" could Defendant "seize the respirators and turn them over to proper authorities."

46. Instead, Defendant falsely claimed that the masks were counterfeit (which has nothing to do with a fit test) and turned them over to the United States Customs and Border Patrol. In doing so, Defendant intentionally interfered with

10

Plaintiff's possessory interest in the masks and denied and/or violated Plaintiff's dominion, rights, or possession over their property.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter a judgment against Defendant, granting Plaintiff the following relief:

1. Entering judgment in favor of Plaintiff on each and every cause of action;

2. Awarding Plaintiff damages in the amount of $2,880,380;

3. Awarding Plaintiff pre-judgment interest on the amount of damages, to be calculated at a rate of nine percent, accruing from October 14, 2020, and post-judgment interest at the rate specified in 28 U.S.C. § 1961(a);

4. Awarding Plaintiff costs of the suit and attorney's fees; and

5. Such other relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues that are so triable.

Dated: February 22, 2022

        Respectfully submitted,

        RUBINSTEIN & COROZZO, LLP

By: /s/ Joseph R. Corozzo
Joseph R. Corozzo
260 Madison Avenue, 22nd Floor
New York, New York 10016
(212) 545-8777
jcorozzo@rubcorlaw.com
*Attorneys for Plaintiffs*