UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
EDWARD ROBERTS, LLC, d/b/a
ERlifescience,

                       Plaintiff,                       **MEMORANDUM & ORDER**
                                                                22-CV-0985 (PKC) (CLP)

        - against -

INDIANA ECONOMIC DEVELOPMENT
CORP.,

                       Defendant.
---------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

Plaintiff Edward Roberts, LLC, doing business as ERlifescience ("Edward Roberts") brings this diversity action against Defendant Indiana Economic Development Corp. ("IEDC") for claims of breach of contract and conversion. (Compl., Dkt. 1.) Before the Court is Defendant's motion for summary judgment. (Mot. Summ. J., Dkt. 69.) For the reasons explained below, Defendant's motion is granted in part, and both of Plaintiff's claims are dismissed.

## BACKGROUND

### I. Factual Background[1]

IEDC is "a body politic and corporate, not a state agency but an independent instrumentality exercising essential public functions" for the state of Indiana ("Indiana"). Ind.

---

[1] Unless otherwise noted, a standalone citation to a party's Local Rule 56.1 statement denotes that this Court has deemed the underlying factual allegation undisputed. Any citation to a 56.1 statement incorporates by reference the documents cited therein; where relevant, however, the Court may cite directly to an underlying document. The Court construes any disputed facts in the light most favorable to Plaintiff for purposes of Defendant's summary judgment motion. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13 F.4th 247, 259 (2d Cir. 2021) (citing *Jackson v. Fed. Express*, 766 F.3d 189, 192 (2d Cir. 2014)). But where either party (i) admits or (ii) denies certain of the facts alleged in the other's 56.1 statement without citing to admissible evidence, the Court may deem any such facts undisputed. Loc. Civ. R. 56.1(c)–(d).

1

Code § 5-28-3-2(a). Indiana established IEDC to "lead the state's economic development efforts," "carry out" certain programs, and "perform other essential public services for the state." *Id.* § 5-28-1-1(b)(3). In return for these efforts, the Indiana general assembly appropriates state funds to IEDC, *id.* § 5-28-1-1(4), though IEDC can also "[s]olicit funding from the private sector for selected initiatives," *id.* § 5-28-6-1(6). From March 2020 through early 2021, the beginning of the COVID-19 pandemic, IEDC purchased for Indiana the majority of the state's personal protective equipment ("PPE"). (Pl.'s Resp. to Def.'s R. 56.1 Statement ("Pl.'s 56.1 Resp."), Dkt. 72-2, ¶ 2; *see also* Bosso[2] Dep. Tr. 1, Dkt. 69-1, at 15:15–16:4.) From February 2020 through August 2021, IEDC bought approximately three to six million Guangzhou Harley Commodity Company ("Harley") masks for Indiana's COVID-19 response. (Pl.'s 56.1 Resp., Dkt. 72-2, ¶ 5.)

### A. The Beginning of the Edward Roberts-IEDC Relationship

Edward Roberts "is a domestic limited liability corporation with . . . its principal place of business" in New York at the time of the relevant events. (Am. Answer, Dkt. 31, ¶ 3.) In September 2020, Matthew Dweck ("Dweck"), a partner at Edward Roberts, offered to sell N-95 masks (the "Masks") to IEDC.[3] (Pl.'s 56.1 Resp., Dkt. 72-2, ¶ 11; Dwek Dep. Ex. 27, Dkt. 69-12,

---

[2] Luke Bosso ("Bosso") was IEDC's Chief of Staff in 2020. (Pl.'s 56.1 Resp., Dkt. 72-2, ¶ 1.)

[3] In its Response to Defendant's Rule 56.1 Statement, Plaintiff repeatedly objects to the Court's consideration of certain statements "because Defendant has changed [its 56.1 Statement] from what was included in the Proposed Rule 56.1 statement" that Defendant submitted in connection with its May 2024 request for a pre-motion conference ("PMC"). (Pl.'s 56.1 Resp., Dkt. 72-2, ¶ 11; Def.'s Proposed R. 56.1 Statement, Dkt. 56-1, ¶ 11; Def.'s PMC Request, Dkt. 53.) As the Court previously stated, "[t]he Court does not deem . . . proposed 56.1 statements final statements to which the parties are bound." (11/12/2024 Dkt. Order.) Therefore, Plaintiff's objections on this ground are baseless, and the Court disregards them.

at ECF[4] 3.) IEDC requested that Edward Roberts send samples of the Masks, and to hold 1,000,000 of them for IEDC. (Pl.'s 56.1 Resp., Dkt. 72-2, ¶¶ 12–13.) IEDC received the sample Masks on September 22, 2020. (*Id.* ¶ 15.) On September 25, 2020, Dweck sent Bosso an "Authenticated Master Distributor certificate [from] Harley," which Bosso understood to mean that Edward Roberts would be purchasing the Masks directly from Harley. (Pl.'s 56.1 Resp., Dkt. 72-2, ¶¶ 17–18; Bosso Dep. Ex. 32, Dkt. 69-13, at ECF 1; Bosso Dep. Tr. 2, Dkt. 69-3, at 309:19–23.) In either late September or early October 2020, either Bosso or someone else who was "helping Indiana procure goods from China" contacted the federal government about suspicions that the sample Masks Edward Roberts had sent IEDC were counterfeit. (Pl.'s 56.1 Resp., Dkt. 72-2, ¶ 25; Am. Answer, Dkt. 31, ¶ 8–9.[5]) On October 8, 2020, Bosso and Dweck reached agreement on terms of a purchase of Masks. (Pl.'s 56.1 Resp., Dkt. 72-2, ¶¶ 26–27.)

B. **Delivery of the Masks**

Edward Roberts delivered the Masks to a National Guard facility in Indiana in two shipments, the first on October 9, 2020, and the second on October 14, 2020. (Pl.'s 56.1 Resp., Dkt. 72-2, ¶¶ 38–39.) On October 9, 2020, Bosso met Department of Homeland Security ("DHS") Agent Clancy Dunnigan ("Agent Dunnigan") at the National Guard facility. (*Id.* ¶ 40.) Bosso

---

[4] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

[5] In the Amended Answer, Defendant stated that as of September 22, 2020, Bosso "believed the [M]asks Edward Roberts sent were fake and that Bosso had contacted federal authorities that Edward Roberts was seeking to sell fake masks," but in Defendant's Rule 56.1 Statement, Defendant wrote that "[i]n early October 2020, a person helping Indiana procure goods from China contacted the federal government because it was suspected that [M]asks that Edward Roberts had sent were counterfeit." (Am. Answer, Dkt. 31, ¶ 9; Pl.'s 56.1 Resp., Dkt. 72-2, ¶ 25.) Plaintiff protests this inconsistency, but neither denies that, at some point, someone alerted the federal government to suspicions that the Masks were counterfeit, nor offers admissible evidence to contest these claims. (Pl.'s 56.1 Resp., Dkt. 72-2, ¶ 25.) Accordingly, the Court deems the above fact undisputed. Loc. Civ. R. 56.1(c)–(d).

inspected the Masks when they arrived, and testified that there were inconsistencies between the appearances of the Masks' cartons, boxes, and packaging and other Harley face masks IEDC had purchased before; further, the Masks delivered on October 9, 2020, were "very different from the sample[]" Masks.[6] (*Id.* ¶ 41; Bosso Dep. Tr. 1, Dkt. 69-1, at 217:22–219:3.) Bosso took three or four individual Mask boxes back to IEDC for testing, (Bosso Dep. Tr. 1, Dkt. 69-1, at 219:8–220:7), but by that point "had noticed so many discrepancies, testing was . . . secondary" as the Masks "didn't pass our standards," (*id.* at 220:8–13). Agent Dunnigan became aware of the discrepancies on October 9, 2020. (*Id.* at 220:18–24.)

The second shipment of Masks from Plaintiff was delivered on October 14, 2020, and was seized that day. (Pl.'s 56.1 Resp., Dkt. 72-2, ¶¶ 39, 47.) The parties dispute whether the first shipment was also seized on October 14, 2020,[7] or whether it was seized the day it was delivered, October 9. (*Id.* ¶¶ 40, 47.) The seizure receipt from DHS reflects a seizure date of October 14, 2020, for nearly one million Masks, the amount of both shipments combined. (*Id.* ¶ 58; DHS Custody Receipt, Dkt. 69-18; Pl.'s Br. Opp'n Def.'s Mot. Summ. J. ("Opp'n"), Dkt. 72-1, at 20.) Bosso testified that when he left the National Guard facility on October 9, "the federal government was taking control of the [M]asks." (Bosso Dep. Tr. 1, Dkt. 69-1, at 220:18–221:8.) Bosso did not direct Agent Dunnigan to seize the Masks and testified that Agent Dunnigan decided to do so on his own. (Pl.'s 56.1 Resp., Dkt. 72-2, ¶ 48; Bosso Dep. Tr. 2, Dkt. 69-3, at 329:25–330:6.[8])

---

[6] Plaintiff disputes Bosso's testimony on this and other facts because Bosso uses the words "we" and "knew." (*See, e.g.*, Pl.'s 56.1 Resp., Dkt. 72 2, ¶ 41 ("Defendant does not cite to admissible evidence because of the repeated references to 'we' did and knew.").) This is not a valid ground to object to Bosso's testimony, and Plaintiff does not identify admissible evidence to dispute these facts. Thus, the Court deems them undisputed. Loc. Civ. R. 56.1(c)–(d).

[7] The Court discusses this further *infra*.

[8] Plaintiff disputes this statement, claiming that the portion of Bosso's testimony that supports it contains hearsay because Bosso testified about what Agent Dunnigan said, "to the best

4

C.  **Testing and Follow-Up**

On October 14, 2020, Bosso emailed Dweck that IEDC would "begin[] our due diligence now." (Pl.'s 56.1 Resp., Dkt. 72-2, ¶ 49.) After this, Bosso cut off communications with Plaintiff because Agent Dunnigan had instructed him not to communicate further with Edward Roberts while the federal government conducted an undercover investigation. (*Id.* ¶ 51; Bosso Dep. Tr. 2, Dkt. 69-3, at 346:9–348:9.) On October 16, 2020, Bosso himself conducted "the Indiana fit test," which tested "how long it takes to taste or smell . . . smoke," on one Mask from the first shipment. (*Id.* ¶ 50; Bosso Dep. Tr. 2, Dkt. 69-3, at 336:17–19, 339:3–10, 360:9–17.) Bosso testified that the Masks did not pass Indiana's fit test, because "as soon as the smoke hit[] the mask, [he] already started tasting it, coughing[,] and it irritated [his] eyes and nose."[9] (Bosso Dep. Tr 2, Dkt. 69-3, at 330:11–18.)

By October 24, 2020, Dweck was told by a state investigator "who referred to himself as Casey Donoghue" that "everything needed to be up and up and straight on all these deals for PPE

---

of [Bosso's] recollection."  (Pl.'s 56.1 Resp., Dkt. 72-2, ¶ 48; Bosso Dep. Tr. 2, Dkt. 69-3, at 329:18–24.)  But, in addition to testifying to Agent Dunnigan's words, Bosso also testified that he did not direct Agent Dunnigan to seize the Masks, and that the agent made this determination on his own. (Bosso Dep. Tr. 2, Dkt. 69-3, at 329:25–330:6.)  As this portion of Bosso's testimony is not hearsay and adequately supports the statement above, and as Plaintiff has not disputed this statement based on admissible evidence, the Court deems it undisputed.  Loc. Civ. R. 56.1(c)–(d).

[9] Plaintiff disputes this, claiming that NIOSH and the CDC determined that the same batch of Masks were effective, and that "whether the test Bosso performed was actually a 'fit test' is an issue for the finder of fact."  (Pl.'s 56.1 Resp., Dkt. 72-2, ¶ 50 (citing *Burger King Corp. v. Horn & Hardart Co.*, 893 F.2d 525, 528 (2d Cir. 1990)).)  As discussed *infra*, *see* Discussion § III.B., the contract between Edward Roberts and IEDC required the Masks to "pass [the] Indiana fit test," (10/8/2020 Bosso Email, Dkt. 69-14, at ECF 8–9).  But it is not relevant whether another entity determined the Masks were effective or whether the "Indiana fit test" is a "fit test" at all; what is relevant here is whether Bosso and IEDC conducted the applicable test and determined that the Masks did not pass that test.  Plaintiff has not identified any admissible evidence to counter IEDC's statement that Bosso conducted the "Indiana fit test" and that the Masks did not pass that test.  The Court accordingly deems this statement undisputed.  Loc. Civ. R. 56.1(c)–(d).

before anyone could get paid." (Pl.'s 56.1 Resp., Dkt. 72-2, ¶ 54; Dweck Dep. Tr., Dkt. 69-9, at 128:6–11.) On or about November 18, 2020, IEDC obtained a letter from Harley's Chairman, Meiging Xu, stating that Harley "has not conducted any business with ER Life Sciences or Edward Roberts, LLC," and Harley "do[es] not know this company at all." (Pl.'s 56-1 Resp., Dkt. 72-2, ¶ 56; Bosso Dep. Ex. 83, Dkt. 69-7, at ECF 1.) The letter further states that Harley never released an authorization letter to Edward Roberts. (*Id.* at ECF 2.)

Edward Roberts sent IEDC three invoices with due dates of October 24 and 29, 2020. (Def's Resp. to Pl.'s R. 56.1 Statement ("Def.'s 56.1 Resp."), Dkt. 74, ¶¶ 81, 84.) On December 4, 2020, Phillip Fowler ("Fowler"), IEDC's Vice President and General Counsel, emailed Edward Roberts that IEDC had "turned the [M]asks over to the proper authorities." (Pl.'s 56-1 Resp., Dkt. 72-2, ¶ 57; Bosso Dep. Ex. 87, Dkt. 69-8.) IEDC never sent a purchase order to Edward Roberts. (Def.'s 56.1 Resp., Dkt. 74, ¶ 85.)

This litigation followed.

## II. Procedural History

Plaintiff filed the Complaint in this action on February 23, 2022, bringing claims of breach of contract and conversion. (Compl., Dkt. 1.) On November 21, 2022, the Court denied Defendant's motion to dismiss or transfer venue. (Dkt. 23.) The Court found that this District "is the proper venue for Plaintiff's breach of contract claim but not for Plaintiff's conversion claim." (*Id.* at 8.) "Nevertheless, the Court [chose] to exercise pendant venue as to Plaintiff's conversion claim." (*Id.*)

In May 2024, Defendant filed a letter requesting a PMC for its anticipated motion for summary judgment. (Dkt. 53.) After Plaintiff responded, (Dkt. 54), the Court directed Defendant to "file a proposed 56.1 statement and a 3-page letter with legal citations explaining the bases of

6

its anticipated motion," and allowed Plaintiff "to respond with a 56.1 counterstatement and a letter that addresses the merits of Defendant's anticipated arguments," (5/30/2024 Dkt. Order). The Court reviewed the parties' submissions, denied Defendants' PMC request as unnecessary, and set the briefing schedule for Defendant's motion for summary judgment. (8/8/2024 Dkt. Order.) Defendant's motion for summary judgment was fully briefed on December 13, 2025. (Mot. Summ. J., Dkt. 69.)

**LEGAL STANDARD**

To obtain summary judgment, the moving party must establish that "there is no genuine dispute as to any material fact," and, thus, that the party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona College*, 521 F.3d 130, 132 (2d Cir. 2008). "Before summary judgment may be entered, the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed." *Jackson v. Fed. Express*, 766 F.3d 189, 194 (2d Cir. 2014) (citing *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004)). "Where the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of the claim, any factual disputes with respect to other elements become immaterial and cannot defeat a motion for summary judgment." *Chandok v. Klessig*, 632 F.3d 803, 812 (2d Cir. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

"The moving party bears the burden of showing that [they are] entitled to summary judgment." *Ramirez v. Rifkin*, 568 F. Supp. 2d 262, 267 (E.D.N.Y. 2008). Where the defendant is the moving party, there is "no express or implied requirement" that the defendant "negat[e] [the plaintiff's] claim" with evidence of its own, as long as it "point[s] out to the district court . . . that

7

there is an absence of evidence to support [the plaintiff's] case." *Celotex Corp.*, 477 U.S. at 323, 325 (emphasis omitted). Once a defendant has met this burden, the plaintiff must "go beyond the pleadings" to "designate specific facts showing that there is a genuine issue for trial," *Id.* at 324 (internal quotation marks omitted); *see also D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) (explaining that a "non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence" to defeat summary judgment (collecting cases)).

**DISCUSSION**

**I.    Defendant's Purported Immunity and Related Evidence**

Defendant argues that it is immune from liability under both the Eleventh Amendment to the United States Constitution and Indiana's Tort Claims Act ("ITCA"). (Def.'s Br. Supp. Mot. Summ. J. ("Br."), Dkt. 70, at 2.) For purposes of this Memorandum & Order, the Court assumes without deciding that Defendant is not immune under either the Eleventh Amendment or the ITCA.

For its part, Plaintiff dedicates a significant portion of its Opposition challenging the admissibility and credibility of an affidavit from Robert Paglia (the "Paglia Affidavit"), (Dkt. 69-27), IEDC's Senior Vice President and Chief Administrative Officer in 2020, (Pl.'s 56.1 Resp., Dkt. 72-2, ¶ 64). Plaintiff argues that the Paglia Affidavit is based on hearsay, rather than personal knowledge, "contains conclusory allegations and improper legal conclusions," and contradicts Paglia's deposition testimony. (Opp'n, Dkt. 72-1, at 2–7.) Because the Paglia Affidavit is primarily relevant to Defendant's arguments regarding its claimed Eleventh Amendment immunity, the Court need not resolve this issue. However, the Court notes that, due to the inconsistences that Plaintiff correctly identifies between the Paglia Affidavit and Paglia's earlier, unsworn verification of a supplemental interrogatory response, (*id.* at 3–4), the Court, in

any event, would decline to consider the statements contained in it, *Gold v. Titlevest Agency LLC*, No. 18-CV-0635 (AJN), 2020 WL 2835570, at *5 (S.D.N.Y. June 1, 2020) (explaining that "when 'there is no way to ascertain which portions of [an affidavit are] based on personal knowledge,'" the statements in it "cannot be used to support or oppose a motion for summary judgment" (quoting *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988)). The *documents* attached to the Paglia Affidavit, though, are business records that "may reasonably be reduced to admissible form at trial," and so it is proper for the Court to consider them here. *Perpall v. Pavetek Corp.*, No. 12-CV-0336 (PKC), 2017 WL 1155764, at *9 (E.D.N.Y. Mar. 27, 2017) (citing *Parks v. Blanchette*, 144 F. Supp. 3d 282, 292 (D. Conn. 2015))).

## II. Conversion Claim

Defendant argues that Plaintiff's conversion claim "fails as a matter of law because IEDC did not convert anything." (Br., Dkt. 70, at 15.) Rather, "[t]he federal government exercised its authority under federal law to seize goods suspected of being counterfeit and it has refused to relinquish them." (*Id.*) Plaintiff counters that IEDC first took possession of the Masks and then wrongfully transferred them to the federal government. (Opp'n, Dkt. 72-1, at 20–21.)

### A. Choice of Law

Since the Court has jurisdiction here pursuant to 28 U.S.C. § 1332(a)(1), it applies New York's choice-of-law rules. *Gov't Emps. Ins. Co. v. Oneyma*, --- F. Supp. 3d ---, No. 24-CV-5287 (PKC) (JAM), 2025 WL 1891967, at *9 (E.D.N.Y. July 9, 2025) (citing *Maryland Cas. Co. v. Cont'l Cas. Co.*, 332 F.3d 145, 151 (2d Cir. 2003)). "'[T]he relevant analytical approach to choice of law in tort actions' is the 'interest analysis,'" meaning that "the law of the jurisdiction having the greatest interest in the litigation will be applied." *White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 460 F.3d 281, 284 (2d Cir. 2006) (quoting *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539 n.5 (2d Cir. 1997)). "If conflicting conduct-regulating laws are at

9

issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Id.* (quoting *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (1993)). Here, Defendant claims that Indiana law governs Plaintiff's conversion claim, and Plaintiff does not address the issue. (Br., Dkt. 70, at 15; Opp'n, Dkt. 72-1, at 20–21.) As the events that Plaintiff claims constitute conversion took place in Indiana, the Court applies Indiana law.

### B.      Analysis

"Conversion, as a tort, consists either in the appropriation of the personal property of another to the party's own use and benefit, or in its destruction, or in exercising dominion over it, in exclusion and defiance of the rights of the owner or lawful possessor, or in withholding it from [their] possession, under a claim and title inconsistent with the owner's." *Computs. Unlimited, Inc. v. Midwest Data Sys., Inc.*, 657 N.E.2d 165, 171 (Ind. Ct. App. 1995) (quoting *Shank Fireproof Warehouse Co. v. Harlan*, 29 N.E.2d 1003, 1005 (Ind. App. 1940)).

Much of the parties' arguments rest on whether Defendant ever took possession of the Masks before DHS seized them. IEDC argues that it did not because it "did not accept the [M]asks because they did not pass Indiana's inspection," and then the "federal government . . . took control of the Masks." (Br., Dkt. 70, at 16.) Plaintiff counters that IEDC "seized Edward Robert[s'] property and then transferred it to federal authorities." (Opp'n, Dkt. 72-1, at 21.) Plaintiff posits that several emails support its version of events. First, it claims IEDC admitted to taking possession of the Masks in Fowler's (IEDC Vice President and General Counsel) December 4, 2020 email to Plaintiff, in which he wrote that "the IEDC has turned the [M]asks over to the proper authorities." (*Id.* at 20 (quoting Bosso Dep. Ex. 87, Dkt. 69-8).) Plaintiff also points to an October 9, 2020 email where Bosso wrote that IEDC has the Masks "stored at [its] warehouse," and an October 14, 2020 email where "[Agent] Dunnigan told Bosso 'I'll have a hand

receipt for you showing we took custody.'" (*Id.* (citations omitted); *see also* DHS Custody Receipt, Dkt. 69-18 (showing 10/14/2020 seizure of 998,740 "COUNTERFEIT N95 MASKS").) According to Plaintiff, "there would be no reason for Agent Dunnigan to give Bosso a receipt unless he took custody of property *from Bosso*." (Opp'n, Dkt. 72-1, at 20.) The Court assumes without deciding that IEDC took possession of the Masks before DHS seized them; this, though, does not resolve the material issue here, which is whether IEDC "appropriate[ed]," "exercise[ed] dominion over," or "with[held]" the Masks from Plaintiff's "possession, under a claim and title inconsistent with [Plaintiff's]." *Computs. Unlimited, Inc.*, 657 N.E.2d at 171.

To that end, Plaintiff implicitly argues that Defendant wrongfully transferred the Masks to the federal government. Plaintiff analogizes this case to an Alaska Supreme Court case involving local police who, while executing a search warrant, seized cash from a person's home. (Opp'n, Dkt. 72-1, at 21 (citing *Johnson v. Johnson*, 849 P.2d 1361, 1362 (Alaska 1993)).) Though state law required the police to "return the warrant and the [seized cash] promptly to the [state] court" that had issued the warrant, *Johnson*, 849 F.2d at 1364, the police instead "transferred the money to the federal Drug Enforcement Administration ('DEA')." *Id.* at 1362. The court in *Johnson* concluded that the City had "committed a conversion" because the local police "unilaterally transferr[ed] the property [to the DEA] without any authority and in contravention of state statutes." (Opp'n, Dkt. 72-1, at 21 (quoting *id.* at 1365).) In its Reply, IEDC states that, unlike the local police's unlawful transfer to the federal law enforcement agency in *Johnson*, here, DHS lawfully seized the Masks pursuant to 19 U.S.C. § 1526(e) ("Section 1526(e)").[10] (Reply, Dkt. 73, at 8.) IEDC adds that "Indiana 'encourag[es] private citizens and victims not only to report crime,

---

[10] Section 1526(e) states that "[a]ny such merchandise bearing a counterfeit mark . . . imported into the United States . . . shall be seized and, in the absence of the written consent of the trademark owner, forfeited for violations of the customs laws." 19 U.S.C. § 1526(e).

but also to assist law enforcement with investigating and apprehending individuals who engage in criminal activity." (Br., Dkt. 70, at 18 (citing *Williams v. Tharp*, 914 N.E.2d 756, 762 (Ind. 2009)).) IEDC correctly notes that Edward Roberts "has not designated any evidence or cited any authority that IEDC acted illegally," nor has it "designated any evidence or cited any authority that IEDC could somehow direct DHS to seize the [M]asks or that it did so." (Reply, Dkt. 73, at 8); *see also Akter v. Target Corp.*, No. 22-CV-0707 (PKC) (JRC), 2024 WL 1142387, at *3 (E.D.N.Y. Mar. 15, 2024) ("A movant may demonstrate the absence of a material factual dispute by pointing to the lack of evidence in support of an essential element of the plaintiff's claim." (citing *Souza v. Exotic Island Enters., Inc.*, 68 F.4th 99, 108 (2d Cir. 2023))). In sum, Plaintiff has presented no evidence to support its claim that IEDC committed the tort of conversion under Indiana law.

\* \* \*

Thus, even if Defendant briefly took possession of the Masks before DHS seized them, because Plaintiff has presented no evidence that IEDC acted unlawfully or that DHS lacked the authority to seize the Masks, Plaintiff's conversion claim fails as a matter of law.

### III. Breach of Contract Claim

Defendant argues that Plaintiff's breach of contract claim "fails as a matter of law because [under the contract] IEDC could refuse the Masks for any reason[,] and it did so." (Br., Dkt. 70, at 23.) Edward Roberts attempts to create a dispute of material fact as to which of three documents is the controlling contract, and argues that it is at least a dispute of material fact as to whether IEDC "seasonably" notified Edward Roberts that it was rejecting the Masks. N.Y. U.C.C. § 2-327(1)(b).

## A. Choice of Law

"Under the law of New York, the forum state, the first step in a choice of law analysis is to determine whether an actual conflict exists between the laws of the jurisdictions involved." *Cont'l Cas. Co. v. Contest Promotions NY, LLC*, No. 15-CV-0501 (MKB), 2016 WL 1255726, at *2 (E.D.N.Y. Mar. 28, 2016) (quoting *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 433 (2d Cir. 2012)). "Where there is no conflict, 'a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it.'" *Id.* (quoting *Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004)). Here, Defendant argues that the underlying contract is a "sale on approval" contract, the law for which is the same in New York and in Indiana. (Mem, Dkt. 70, at 23.) Plaintiff does not dispute this. As "sale on approval" contracts are defined the same in New York and Indiana, the Court applies New York law. *See* N.Y. U.C.C. § 2-326(1)(a) (defining a "sale on approval" as existing when "delivered goods" are "delivered primarily for use" and "may be returned by the buyer even though they conform to the contract"); Ind. Code § 26-1-2-326(1)(a) (same).

## B. The Governing Contract

Plaintiff claims that there is a dispute over which written agreement is the operative contract. (Opp'n, Dkt. 72-1, at 23.) There are three options: (1) an October 8, 2020 email from Bosso ("10/8/2020 Bosso Email"); (2) an October 9, 2020 IEDC Purchase Order ending in -1172 ("1172 Purchase Order"); and (3) an October 9, 2020 IEDC Purchase Order ending in -1173 ("1173 Purchase Order"). (*See* 10/8/2020 Bosso Email, Dkt. 69-14, at ECF 8–9; 1172 Purchase Order, Dkt. 69-20; 1173 Purchase Order, Dkt. 69-27, at ECF 60.) As a preliminary matter, the Court notes that the parties agreed in Plaintiff's Response to Defendant's Rule 56.1 Statement that "[o]n October 8, 2020, Bosso and Dweck reached agreement on terms of a purchase of masks,"

13

and included an image of the 10/8/2020 Bosso Email.  (Pl.'s 56.1 Resp., Dkt. 72-2, ¶ 26.)  Thus, it appears that the parties agree that the operative contract is the 10/8/2020 Bosso Email.[11]

Still, the Court acknowledges Plaintiff's point that Defendant uses the term "Purchase Order," rather than references verbatim the 10/8/2020 Bosso Email, when discussing the terms of the parties' agreement.  (*See, e.g.*, Br., Dkt. 70, at 9.)  But nearly every time IEDC uses that term, it cites to the 10/8/2020 Bosso Email.  (*Id.* (citing Def.'s 56.1 Statement, Dkt. 71, ¶ 26 (10/8/2020 Bosso Email)); *but see id.* at 23 (citing 1172 Purchase Order, Dkt. 69-20).)  The Court does not find that this difference in nomenclature creates a dispute of material fact.  *Loreley*, 13 F.4th at 259 ("A fact is material if it 'might affect the outcome of the suit under the governing law.'" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986))).  Furthermore, because all three written agreements contain the same relevant terms and conditions, it is immaterial which one governs here.  All three contain the following clauses: (1) "15 calendar days invoice will be issued after delivery";[12] (2) "Respirators must pass Indiana fit test plus all federal standards as layer [sic] out by CDC/NIOSH/FDA and have all documentation that shows they are real"; (3) "If respirators do not pass inspection[,] [IEDC] will not pay for the respirators"; (4) "[IEDC] has right to refuse respirators if they show up in unusable conditions"; (5) "[Edward Roberts] acknowledges

---

[11] This conclusion is also intuitive because the parties agree that IEDC never sent a purchase order to Edward Roberts.  (Def.'s 56.1 Resp., Dkt. 74, ¶ 85.)

[12] The Court acknowledges a slight discrepancy between the three documents in this first clause.  The 10/8/2020 Bosso Email and 1173 Purchase Order both say, "15 calendar days invoiced will be issued," while the 1172 Purchase Order says, "15 calendar days invoice will be issued after delivery."  While neither phrasing is a model of clarity, the Court notes that the language in the 10/8/2020 Bosso Email and the 1173 Purchase Order for the first clause is facially ambiguous.  However, the meaning of the first clause in the 1172 Purchase Order is sufficiently clear, and Plaintiff concedes that the first clause in the 10/8/2020 Bosso Email means "that an invoice would issue 15 calendar days after delivery."  (Opp'n, Dkt. 72-1, at 24.)  Thus, any ambiguity between the written clauses is not material for purposes of this dispute.

these respirators are NIOSH/CDC approved"; (6) "[IEDC] has right to refuse respirators for any reason up to the point invoice is issued"; and (7) "If respirators do not pass fit test standards [IEDC] can seize the respirators and turn them over to proper authorities." (10/8/2020 Bosso Email, Dkt. 69-14, at ECF 8–9; 1172 Purchase Order, Dkt. 69-20; 1173 Purchase Order, Dkt. 69-27, at ECF 60.)

### C. Analysis

Defendant argues that its rejection of the Masks was timely as a matter of law under the terms of the contract and under the common law governing acceptance of goods under a sale of approval.

#### 1. Timeliness Under the Contract

Defendant points to two contract clauses to argue that it timely rejected the Masks: the third clause ("If respirators do not pass inspection[,] Indiana will not pay for the respirators") and the sixth ("Indiana has [the] right to refuse respirators for any reason up to the point invoice is issued"). (Br., Dkt. 70, at 23.) Because the first clause also states that the invoice for payment "will be issued" 15 days after delivery, (1172 Purchase Order, Dkt. 69-20), the sixth clause allowed IEDC to reject the Masks "for any reason" up to 15 days after delivery, presuming the invoice for payment was timely issued. Plaintiff argues that IEDC's rejection was untimely because "any right to refuse expired as early as October 14[,] when the third invoice was issued." (Opp'n, Dkt. 72-1, at 24.) As explained, IEDC did not notify Edward Roberts of its rejection of the Masks until December 4, 2020. (Pl.'s 56-1 Resp., Dkt. 72-2, ¶ 57.) If the sixth clause were the only applicable clause that allowed IEDC to reject the Masks, then IEDC's rejection would have been untimely. But several clauses, not just the sixth, provide grounds for IEDC to reject the Masks.

Plaintiff does not acknowledge that the third clause, which allows IEDC to reject the Masks if they "do not pass inspection," contains no temporal limitations or references to "the point [the]

15

invoice is issued." (10/8/2020 Bosso Email, Dkt. 69-14, at ECF 8; Opp'n, Dkt. 72-1, at 24–25.) "In an action on a contract . . . summary judgment is perforce improper unless the terms of the agreement are 'wholly unambiguous.'" *Wards Co., Inc. v. Stamford Ridgeway Assocs.*, 761 F.2d 117, 120 (2d Cir. 1985) (quoting *Heyman v. Com. & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975)). "A Court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity, and words do not become ambiguous simply because lawyers or lay[persons] contend for different meanings." *Id.* (quoting *Downs v. Nat'l Cas. Co.*, 146 Conn. 490, 494 (1959)). In New York, "[t]he best evidence of what parties to a written agreement intend is what they say in their writing." *Donohue v. Cuomo*, 38 N.Y.3d 1, 12 (2022) (quoting *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (2002)). Here, the parties agreed to limit IEDC's ability to reject the Masks "for any reason up to the point [an] invoice is issued," but did not do the same with respect to IEDC's ability to reject the Masks if they "[did] not pass inspection." (10/8/2020 Bosso Email, Dkt. 69-14, at ECF 8.) Thus, the unambiguous interpretation of the parties' written agreement is that IEDC's ability to reject the Masks if they did not pass inspection was not limited to "the point [an] invoice is issued." (*Id.*) Accordingly, IEDC's rejection of the Masks for not passing inspection was not untimely merely because that rejection occurred after Edward Roberts issued the invoices.

    2.   Timeliness Under Common Law

Still, it is possible for Defendant's rejection of the Masks for failure to pass IEDC's inspection to be untimely on other grounds. "Under a sale on approval unless otherwise agreed . . . failure seasonably to notify the seller of election to return the goods is acceptance." N.Y. U.C.C. § 2-327(1)(b). "An action is taken seasonably if it is taken at or within the time agreed or, if no time is agreed, at or within a reasonable time." *Id.* § 1-205(b). "Whether a time for taking an action . . . is reasonable depends on the nature, purpose, and circumstances of the

16

action." *Id.* § 1-205(a). "Generally, what is a timely rejection is a question of fact for the jury," but "when only one inference may be drawn as to the reasonableness of the time in which defendant rejected the goods, it becomes a question of law." *Tabor v. Logan*, 495 N.Y.S.2d 67, 68 (2d Dep't 1985) (citations omitted). When "the goods in question [are] not perishable or rendered obsolete by the passage of time," and when a prospective buyer takes some amount of time to investigate the goods before rejecting them, even a two-year delay in rejection can be reasonable as a matter of law. *See N.Y.C. Off-Track Betting Corp. v. Safe Factory Outlet, Inc.*, 809 N.Y.S.2d 70 (1st Dep't 2006) (finding timely as a matter of law the February 2001 rejection of non-perishable goods that were first installed in February 1999 and that required a lengthy inspection period).

Here, Defendant argues that its delay in notifying Plaintiff of its rejection of the Masks was "reasonable as a matter of law because the federal government seized the Masks" and "instructed . . . Bosso not to communicate with Edward Roberts[] while the federal government conducted an undercover investigation." (Br., Dkt. 70, at 25.) Edward Roberts makes the conclusory statement that "IEDC did not seasonably notify Edward Roberts that IEDC was refusing the [M]asks," and so "IEDC accepted them." (Opp'n, Dkt. 72-1, at 25.) In the alternative, Edward Roberts states that "this is an issue for the trier of fact." (*Id.*) But Edward Roberts presents no evidence or caselaw to support its claim that IEDC's rejection of the Masks was untimely as a matter of law. *See, e.g.*, *B/R Sales Co., Inc. v. Krantor Corp.*, 640 N.Y.S.2d 204, 205 (2d Dep't 1996) (finding timing of rejection unreasonable as a matter of law when plaintiff's president stated in an affidavit "that, in the parties' industry, 'all claims must be made upon a delivery or within a reasonable time, 48 hours after acceptance of [the] first shipment or any additional shipments'"). Under the specific "nature, purpose, and circumstances of" this action—where the

17

federal government took control over the non-perishable Masks shortly after they were delivered and instructed IEDC not to contact Edward Roberts while the government's investigation was pending, and where IEDC notified Edward Roberts of its rejection of the Masks less than two months after they were delivered—the only reasonable inference that a jury could draw is that IEDC's rejection was timely. N.Y. U.C.C. § 1-205(a); *N.Y.C. Off-Track Betting Corp.*, 809 N.Y.S.2d at 74.

*   *   *

For the reasons explained above, the Court determines as a matter of law that Defendant's rejection of the Masks was timely under both the contract and common law, and the Court accordingly grants summary judgment as to Plaintiff's breach of contract claim.

## IV. Defendant's Counterclaims

Defendant brought three common-law counterclaims in its Amended Answer, for breach of contract, fraud, and counterfeiting. (Am. Answer, Dkt. 31, ¶¶ 89–116.) Neither party moved for summary judgment as to these counterclaims. As the Court has dismissed both of Plaintiff's claims, Defendant is instructed to inform the Court by October 29, 2025, how it intends to proceed with its counterclaims.

## CONCLUSION

For the reasons explained above, Defendant's motion for summary judgment is granted in part, and Plaintiff's conversion and breach of contract claims are dismissed. Defendant is instructed to inform the Court by October 29, 2025, how it intends to proceed with its counterclaims.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 29, 2025
Brooklyn, New York